**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| _____ | : | |
| MINERVINO SANTANA- | : | |
| SARDINA | : | |
|     Plaintiff, | : | Civil Action No. 05-4039 (JAP) |
|  | : | |
|     v. | : | **OPINION** |
| JOANNE BARNHART, | : | |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
|         Defendant, | : | |
| _____ | : | |

Appearances:

AGNES S. WLADYKA, ESQ.
Abromson & Carey
60 Park Place, Suite 601
Newark, NJ 07102
        Attorney for Plaintiff

CHRISTOPHER J. CHRISTIE
United States Attorney
SIXTINA FERNANDEZ
Special Assistant U.S. Attorney
c/o Social Security Administration
Office of General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
        Attorney for Defendant

PISANO, District Judge:

Before the Court is Minervo Santana-Sardinas's ("Plaintiff") appeal from the Commissioner of the Social Security Administration's ("Commissioner") final decision denying his request for Disability Insurance Benefits ("DIB").  The Court has jurisdiction to review this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3) and renders its decision without oral argument.  *See* Fed. R. Civ. P. 78.  For the reasons expressed below, the record provides substantial evidence supporting the Commissioner's decision that Plaintiff was not disabled.  Accordingly, the Court affirms.

## I. BACKGROUND

### A. Procedural History

Plaintiff filed an application for DIB March 18, 1996, alleging a severe and disabling back condition.  His claim was denied initially (the record does not reflect the exact date) and again on reconsideration on February 7, 1997.  Plaintiff filed a request for a hearing before an administrative law judge on April 3, 1997.  A hearing was held on February 12, 1998, before Administrative Law Judge Dennis O'Leary ("ALJ").  The ALJ issued a decision February 23, 1998, denying Plaintiff's application.  Plaintiff requested review by the Social Security Appeals Council on March 5, 1998.  Such request was denied on October 27, 2000.

Plaintiff thereafter filed a complaint in the United States District Court for the District of New Jersey, Docket No. 00-cv-5625 (DMC).  By consent order entered January 18, 2002, the matter was remanded for further administrative action.

On March 8, 2002, the Appeals Council remanded the case to to an ALJ.  On May 2, 2002, and November 21, 2002, subsequent hearings before the same ALJ were held in

accordance with that order.  The ALJ issued a decision on December 10, 2002, again denying Plaintiff's application.  Plaintiff timely filed a request for review with the Appeals Council on March 19, 2004.  Plaintiff requested review by the Social Security Appeals Council, and July 12, 2005, that request was denied.  Plaintiff then filed this action challenging the Commissioner's final decision.[1]

**B. Factual History**

Plaintiff was born December 31, 1943, and is a Cuban citizen who is a permanent resident of the United States.  He has a 6th grade education.  His native language is Spanish, and he does not speak, read or write English.  Plaintiff lives alone in a basement apartment.  He cooks and does household chores, but sometimes his brother comes over to help him.  Plaintiff alleges that he does not go shopping, to church or to social events, but friends and relatives come to visit him.  In an interview with an agency examiner Plaintiff indicated that he does not carry anything "heavier than milk . . . for three blocks."  (R. 64).[2]

Between 1980 and 1993, Plaintiff worked for various companies as a factory worker, construction worker and landscaper.  His most recent work was as a cemetery landscaper from 1990 through 1993.  His work was seasonal, and he worked six months out of the year.  This

---

[1]At some point during the long history of this matter, Plaintiff also applied for Supplemental Security Income ("SSI"), which application is not at issue in this case.  With respect to that application, Plaintiff was found to be disabled for SSI purposes as of February 2000.  This case, however, involves a much earlier time period, specifically, from August 1, 1993 (Plaintiff's alleged disability onset date) to September 30, 1995 (the date Plaintiff's insured status expired).

[2] "R." refers to the certified copy of the transcript of the record of proceedings relating to this matter filed by the Commissioner of Social Security.

work required him to lift up to 70 pounds occasionally and be on his feet all day.  Earlier jobs in a factory and in construction required Plaintiff to lift up to 40 pounds occasionally.

Plaintiff alleges that he has been disabled since August 1, 1993, due to back pain. Plaintiff testified that he experiences continuous disabling pain that spans from his neck into his buttocks that "never goes away."  (R. 173).  He stated that he can walk only a couple of blocks before he has to stop because his legs begin to hurt.  Plaintiff also testified that he cannot sit for more than ten or fifteen minutes and he cannot stand for more than fifteen or twenty minutes.  He stated that he spends most of his time lying down.  Plaintiff testified that he takes Motrin for the pain, but "it doesn't do anything."  (R. 174).  At the time Plaintiff testified at the hearing on February 12, 1998, he was not under a doctor's care.  Although he had been to a "General M.D." about two months prior to the hearing, Plaintiff testified that he had not seen an orthopedic doctor for his condition since 1995.

Two years prior to his alleged disability onset date, on August 9, 1991, Plaintiff was involved in a motor vehicle accident.  Shortly thereafter, on August 12, 1991, Plaintiff sought treatment from Dr. Harold Bialsky, a chiropractor, for neck and back pain.  Dr. Bialsky noted some swelling, pain and tenderness in the various spinal regions.  Neurological testing of the deep tendon reflexes showed them to be equal and active, and peripheral sensitivity was equal and intact for Plaintiff's upper extremities.

X-rays taken on August 17, 1991 show no fractures in any of the spinal regions. While the x-rays show no abnormality of the cervical spine, there were degenerative changes (osteophyte formation) in the thorascic spine with the possibility of slight anterior wedging of the vertebral body of T11, and degenerative changes (osteophyte formation) and a slight

rotation from normal curvature in the lumbar spine.

Plaintiff was seen on September 19, 1991, by Dr. Roman Sorin who noted Plaintiff suffered from limitations in movement but did not specify to what degree.  Dr. Sorin observed no sensory deficits, and motor strength in all muscle groups was a full 5/5.  Nerve conduction tests performed by Dr. Sorin were negative, showing no signs of lower motor neuron involvment.  Dr. Sorin recommended Plaintiff continue with physical therapy, use hot packs and a TENS unit (transcutaneous electrical nerve stimulation), and perform range of motion exercises.

MRI testing was performed on Plaintiff on November 1, 1991.  According to the report by Dr. Ricardo Baldonado, the images of the cervical spine show minimal bulging of the disc at C4-5 and C5-6.  The report also states that there is posterial herniation at C6-7 and an indentation of the thecal sac.  No narrowing of the cord is noted and the intensity of the cord is uniform.  Images of the lumbar spine show bulging discs at L1-2 and L5-S1 with indentation of the thecal sac.

On January 23, 1992, Plaintiff was seen by Dr. Imad Baghal complaining of pain to his neck and back.  According to a letter from Dr. Baghal to Plaintiff's counsel dated January 16, 1998, as well as the doctor's billing records, Plaintiff was seen by Dr. Baghal one other time for a follow-up visit on March 2, 1992.  (R. 110).  Plaintiff was diagnosed with a cervical spine sprain with radiculopathy and C4-5 and C5-6 bulging discs; lumbosacral spine sprain with right L5 radiculopathy and L1-2 and L5-S1 bulging discs; C6-7 herniated nucleus pulposus; and thorascic spine sprain. Dr. Baghal stated in his letter that he treated Plaintiff "conservatively," and noted that Plaintiff was also treated by Dr. Bialsky with medications,

home exercises and physiotherapy.  (R. 108).

On January 6, 1995, Plaintiff was involved in a second motor vehicle accident.  He did not go to the hospital right away, but rather waited a several days before seeking medical attention.  Plaintiff was seen on January 16, 1995, by Dr. John Croft complaining of headaches and back pain.  In a physical examination Plaintiff exhibited pain, tenderness and spasms in various spinal regions, and Dr. Croft found that Plaintiff had a limited range of motion in the cervical, dorsal and lumbar regions of his spine.  Dr. Croft prescribed physical therapy, Vicodin, and a TENS unit for home use.

CAT scans done on January 23, 1995, of Plaintiff's head and cervical spine were normal.  A CAT scan of the thorascic spine showed normal bony architecture throughout with no disc herniation and no soft tissue or bony impingement on the spinal canal.  The report noted degenerative joint disease at T10-11 and mild productive changes.   A scan of the lumbsacral spine showed degenerative disc disease at L5-S1 and "borderline" right lateral stenosis.

On March 30, 1995, an MRI study of Plaintiff's lumbosacral spine was done.  The study showed the vertebral bodies to be normally aligned and normal in texture and density. No fracture of bony destruction was seen.  No abnormal intraspinal canal contents were identified.   The MRI did show a small bulging disc annulus at the L5-S1 level.  MRI studies of Plaintiff's knees were performed on May 1, 1995, were normal,

Plaintiff had a neurological consultation with Dr. Ana Miguel-Komotar on February 2, 1995.  Tenderness over the cervical and lumbar paraspinal muscles was noted as well as some limitation in motion.  Plaintiff's coordination and gait were normal, and no motor sensory or

reflex deficits were noted.  Dr. Komotar noted that Plaintiff was "able to p[er]form most of his daily activities."  (R. 81).  Dr. Komotar diagnosed cervical and lumbar sprains and radiculopathy, and noted that Plaintiff was following-up with an orthopedic surgeon and undergoing physical therapy.

A Residual Physical Functional Capacity Assessment form was completed by a state agency medical consultant, but its date is unclear from the record.  This form allows the reviewer to check boxes setting forth his or her conclusions with regard to a claimant's capacity to perform certain types of tasks.  Based on boxes checked on the form, the consultant concluded that Plaintiff retained the residual functional capacity for light work.  On the portion of the form where the doctor was asked to "Explain how and why the evidence supports your conclusions..." and "Cite the specific facts upon which your conclusions are based." (R. 97), there appears only 6-7 completely illegible words.  No where else on the form does the reviewing doctor explain the conclusions.

## II. STANDARD OF REVIEW

A reviewing court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied sub nom. Williams v. Shalala*, 507 U.S. 924 (1993).  "Substantial evidence" means more than "a mere scintilla."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The inquiry is not whether the reviewing court would have made the same determination, but rather whether the Commissioner's conclusion was reasonable.

*Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).  Some types of evidence will not be "substantial."  For example,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g. that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.

*Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)).

The reviewing court, however, does have a duty to review the evidence in its totality. *See Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984).  In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting *Willibanks v. Sec'y of Health & Human Servs.*, 847 F.2d 301, 303 (6th Cir. 1988) (internal citation omitted).  The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing *Brewster v. Heckler*, 786 F.2d 581 (3d Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Mathews*, 574 F.2d 772, 776 (3d Cir. 1978) (quoting *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258 (4th Cir. 1977).  Nevertheless, the district court is not

"empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."

*Williams*, 970 F.2d at 1182 (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir. 1984)).

## A. The Record Must Provide Objective Medical Evidence

Under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*., a claimant is

required to provide objective medical evidence in order to prove his disability.  42 U.S.C. §

423(d)(5)(A). ("An individual shall not be considered to be under a disability unless she

furnishes such medical and other evidence of the existence thereof as the Secretary may

require."); *see also* 42 U.S.C. § 1382c(a)(3)(H)(i).  Accordingly, a plaintiff cannot prove that

he is disabled based solely on his subjective complaints of pain and other symptoms.  He must

provide medical findings that show that he has a medically determinable impairment.  *See* 42

U.S.C. § 423(d)(5)(A); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (defining a

disabled person as one who is " unable to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment . . .").

Furthermore, a claimant's symptoms, "such as pain, fatigue, shortness of breath,

weakness, or nervousness, will not be found to affect . . . [one's] ability to do basic work

activities unless "medical signs"or laboratory findings show that a medically determinable

impairment(s) is present."  20 C.F.R. § 4040.1529(b); *see Hartranft v. Apfel*, 181 F.3d 358,

362 (3d Cir. 1999) (rejecting claimant's argument that the ALJ failed to consider his

subjective symptoms where the ALJ made findings that complaints of pain and symptoms

were inconsistent with objective medical evidence and claimant's hearing testimony);

*Williams*, 970 F.2d at 1186 (denying claimant benefits where claimant failed to proffer

medical findings or signs that he was unable to work); *Green v. Schweiker*, 749 F.2d 1066,

1069-70 (3d Cir. 1984) (emphasizing that "subjective complaints of pain, without more, do not in themselves *constitute* disability").

**B. The Five-Step Analysis for Determining Disability**

Plaintiff's eligibility for DIB and SSI is governed by 42 U.S.C. §§ 423 and 1382. A claimant is eligible for DIB and SSI if he meets the disability period requirements of 42 U.S.C. § 416(i), and demonstrates that he is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A person is disabled for these purposes if his physical or mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. For the first two steps, the claimant must establish (1) that he has not engaged in "substantial gainful activity" since the onset of his alleged disability, and (2) that he suffers from a "severe impairment" or "combination of impairments." 20 C.F.R. § 404.1520(a)-(c). Given that a claimant bears the burden of establishing these first two requirements, the failure to meet this burden automatically results in a denial of benefits. *See Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).

10

If the claimant satisfies his initial burdens, the third step requires that he provide evidence that his impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("Listing of Impairments").  *See* 20 C.F.R. § 404.1520(d).  Upon such a showing, he is presumed to be disabled and is automatically entitled to disability benefits.  *Id*.  If he cannot so demonstrate, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional capacity" sufficiently permits him to resume his previous employment.  *See* 20 C.F.R. § 404.1520(e).  "Residual functional capacity" is defined as "that which an individual is still able to do despite limitations caused by his or her impairments."  20 C.F.R. § 404.1520(e).  If the claimant is found to be capable of returning to his previous line of work, then he is not "disabled" and not entitled to disability benefits.  20 C.F.R. § 404.1520(e).  Should the claimant be unable to return to his previous work, the analysis proceeds to step five.   To determine the physical exertion requirements of work, jobs are classified as sedentary, light, medium, heavy, and very heavy.  Light, medium and heavy work are defined as follows:

(b) *Light work.*  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

(d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

11

*See* 20 C.F.R. §§ 404.1567 and 416.967.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work. *See* C.F.R. § 404.1520(f). If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits. *Yuckert*, 482 U.S. at 146-47 n5.

## III. THE ALJ'S DECISION DATED DECEMBER 10, 2002

After reviewing the medical evidence of record, which the ALJ summarizes in his decision, and after considering Plaintiff's testimony as well as the opinion (in the form of interrogatories and cross examination testimony) of a medical expert, Dr. Marvin Chirls, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act and regulations at any time prior to September 30, 1995, the expiration of Plaintiff's insured status.[3]

The ALJ determined that Plaintiff met step one of the analysis because he had not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ determined that Plaintiff met step two of the analysis because his impairment, degenerative disc disease, qualified as "severe" under the Social Security regulations. *See* 20 C.F.R. § 404.1520(b). However, the ALJ concluded that Plaintiff did not meet or medical equally any of the impairments listed in 20 C.F.R., Part 404, Appendix 1, Subpart P, Regulations No. 4. Specifically, the ALJ found that

> there is no clinical documentation of any of the requisites of Medical Listing 1.04, pertaining to disorders of the spine. Such manifestations as nerve root compromise associated with motor loss, sensory loss, reflex loss or pseudoclaudication are not present to any degree within the evidence of record.

---

[3]*See* 42 U.S.C. § 423(c)(1) (describing insured status).

(R. 148-49).

The ALJ proceeded to step four of the analysis, which focuses on whether the claimant's residual functional capacity ("RFC") permits him to return to his previous employment. After reviewing the medical evidence and Plaintiff's testimony, the ALJ concluded that Plaintiff retained the RFC to perform heavy work. *See* 20 C.F.R. § 404.1567(b). Based upon the medical evidence of record, the ALJ accepted the assessment by the medical expert, Dr. Marvin Chirls, that the evidence fails to document any disc herniation. The ALJ explained that although Dr. Chirls never examined Plaintiff, the ALJ found Dr. Chirls' opinion to be more consistent with the objective medical evidence and of more probative value than the conclusions of the treating sources.

The ALJ also found that Plaintiff's subjective complaints of pain and debilitation were not entirely credible. The ALJ noted that medical treatment of Plaintiff was "scant" and was "purely conservative in nature," consisting of such things as physical therapy and analgesic medications. (R. 149). He further noted that more significant treatment, such as surgery or trigger point injections, was never recommended, that Plaintiff was never hospitalized or presented to a hospital emergency room as a result of his condition, and there was no record of Plaintiff ever needing any assistive device for ambulation. Also pointed to by the ALJ was the fact that Plaintiff continued to work as a cemetery landscaper for two years after his initial injuries were sustained in 1991, and that Plaintiff's daily activities were not consistent with his allegations of complete incapacitation. Such activities included doing his own cooking and laundry as well as doing household chores.

In concluding that plaintiff was capable of performing heavy work during the relevant

13

time period, the ALJ rejected the findings and opinions rendered by a state agency consultant at earlier stages in the administrative review who concluded that Plaintiff was capable of performing the demands of light work.  The ALJ rejected the assessment as being unexplained ("the rational contained in their assessments is comprised of no more than seven, illegible words") and inconsistent with the objective medical evidence.  (R. 150).

Based upon Plaintiff's RFC to perform heavy work, the ALJ then analyzed whether Plaintiff was capable of performing any of his "past relevant work" prior to September 30, 1995.  *See* 20 C.F.R. § 404.1565.  Plaintiff had past relevant work as a cemetery landscaper, a building maintenance worker, and a factory worker.  The ALJ concluded, based upon the Plaintiff's description of his landscaping work as well as the classification of Plaintiff's past positions by the Dictionary of Occupational Titles, that at all times prior to September 30, 1995, Plaintiff was able to perform his past relevant work either as a cemetery landscaper or building maintenance worker.

Based upon his findings at step four, the ALJ was not required to go on to step five.  Nevertheless, the ALJ found that even assuming *arguendo* that Plaintiff was incapable of performing his past relevant work, a finding of "not disabled" would be appropriate based upon the application of the medical-vocational guidelines contained in 20 C.F.R. Part 404, Appendix 2, Subpart P.  The ALJ noted that taking into account Plaintiff's age and limited education, even if it was determined that Plaintiff was capable of no more than medium work and had never worked before, a finding of "not disabled" would be appropriate under medical-vocational rule 203.18.

Thus, while the ALJ recognized that Plaintiff was found to be disabled for the purposes

14

of supplemental security income eligibility effective February 2000, the ALJ found "no basis to ascribe such a level of inability" to Plaintiff for the period beginning August 1, 1993, through September 30, 1995.

Plaintiff now raises several arguments challenging the ALJ's decision:

1.  The Commissioner improperly evaluated the medical evidence by failing to give appropriate weight to the subjective complaints of pain by Plaintiff and improperly relying upon the testimony of a medical expert.
2.  The Commissioner erred in not fully considering the Plaintiff's non-exertional impairments.
3.  The Commissioner's conclusion that Plaintiff could perform work at all exertional levels except for very heavy work was not supported by the evidence.
4.  The Commissioner improperly found that Plaintiff did not meet or equal a listed impairment.

The Commissioner contends that the ALJ's decision is supported by substantial evidence and therefore should be affirmed.

## IV. DISCUSSION

The issue before this Court is whether the substantial evidence supports the Commissioner's decision that Plaintiff was not under a disability as of his alleged disability onset date of August 1, 1993 through the last date he was eligible for DIB, September 30, 1995.

## A.  Plaintiff's Complaints of Pain Were Properly Considered

Plaintiff argues that the ALJ failed to properly evaluate the medical evidence by failing to give credence to various subjective complaints of Plaintiff.  In his decision, the ALJ specifically addressed Plaintiff's subjective complaints of disabling pain and found them to be not credible.  As discussed above, 20 C.F.R. § 404.1529 requires that the objective medical evidence demonstrate a basis for subjective complaints.  Complaints about pain or other symptoms alone will not establish that a claimant is disabled.  *See* 20 C.F.R. § 404.1529(a).

Rather, these complaints must be coupled with objective medical signs and laboratory findings that demonstrate a medical impairment that could reasonably produce the alleged subjective complaints.  *See id.*

The ALJ first noted that Plaintiff sought little medical care for his condition.  Dr. Baghal's treatment of Plaintiff was "sporadic and conservative in nature," (R. 149) -- indeed, the record reflects that Dr. Baghal saw Plaintiff only twice in early 1992 -- and Dr. Croft's treatment history with Plaintiff spanned only from January to May 1995.  Plaintiff also had a single neurological consultation with Dr. Ana Miguel-Komotar in February of 1995 after a second car accident.  Within the relevant time period, there is no other evidence of medical treatment for Plaintiff's orthopedic condition (the ALJ does note Plaintiff's consultation with Dr. Bialsky, a chiropractor, that took place in 1991 immediately after Plaintiff's first car accident, but this consultation, like Plaintiff's visits to Dr. Baghal, took place long before Plaintiff's alleged disability onset date).  The ALJ found the dearth of medical treatment to be "simply inconsistent with the degree of orthopedic compromise alleged by the claimant."  (R. 149).  The ALJ additionally noted that the "scant" treatment Plaintiff received was "purely conservative in nature, such as physical therapy and analgesic medication," and no treating physician ever recommended more significant treatment such as surgery.  (R. 149).

The ALJ also found Plaintiff's daily activities to be inconsistent with his subjective complaints.  Plaintiff reported that he does household chores and does his own cooking and laundry, and the ALJ found this to be inconsistent with the degree of incapacitation Plaintiff claimed.  Indeed, Dr. Komotar noted that plaintiff is able to perform "most of his daily activities."  (R. 81).  Also, the ALJ noted Plaintiff's gait was described by doctors as "normal"

16

and there was no evidence in the record that Plaintiff ever needed any assistive device to help him get around.  These circumstances, the ALJ concluded, were "not compatible with [Plaintiff's] contentions of debilitation."  (R. 150).

Additionally, the ALJ found the medical evidence to be inconsistent with Plaintiff's claims, pointing to x-rays taken after Plaintiff's second car accident in 1995.  These x-rays show only minor findings, the magnitude of which, as Dr. Chirl testified, would not be uncommon in the majority of individuals over the age of forty.

Consequently, the ALJ's evaluation of Plaintiff's subjective complaints of pain was proper and supported by the substantial evidence.  *See* 20 C.F.R. 404.1529(c).

Plaintiff also argues that the ALJ erred by relying on the opinion of the medical expert, Dr. Chirls.  Dr. Chirls opined that the evidence supports a finding that Plaintiff has neck, low back and leg pain, but that there was no evidence in the record that Plaintiff had a herniated disc. Dr. Chirls indicated in the interrogatories that the basis of his conclusion was that all of Plaintiff's MRIs were normal, no neurological deficits were documented and, overall, Plaintiff's complaints were not supported by the objective medical evidence.  On cross-examination at the supplemental hearing, Dr. Chirls acknowledged he erred in stating in the interrogatories that "all MRIs [are] normal" (R. 205) because an MRI report from November 1, 1991, identifies a herniation at C6-7.  When questioned about his statement that there was "no evidence of herniated disc," (R. 208) in light of this MRI as well as Dr. Baghal's diagnosis of herniated nucleus pulposus at C6-7, Dr. Chirls clarified that his opinion is that there is no evidence in the record to substantiate a diagnosis of a herniated disc.  (R. 259).  On cross-examination, Dr. Chirls explained at length the reasoning behind his opinion, and, consequently, contrary to the

17

assertions of Plaintiff, the Court does not find his opinion to be "conclusory, inherently contradictory and based on careless factual errors."  Pl. Brf. at 20 (quoting *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000)).

Plaintiff argues the opinion of Dr. Chirls is entitled to very little weight because Dr. Chirls did not examine Plaintiff.  The Third Circuit has recognized that a court considering a claim for disability benefits must generally give greater weight to the opinion of a treating physician than to the opinion of a physician who has examined the claimant only once or not at all.  *See Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir.1993);  20 C.F.R. §§ 404.1527(d)(1).  This is known as the "treating physican's rule."

Under the treating physician's rule, the regulations require that the ALJ give controlling weight to a "treating" physician's opinion only if the ALJ "find[s] that a treating source's opinion of the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2).  If the opinion is not given controlling weight, the ALJ must consider additional factors in determining how to weigh the physician's opinion such as the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, supportability, and consistency with the record evidence.  20 C.F.R. § 404.1527(d)(2)-(6).  Under the regulations, the ALJ must provide "good reasons" in his or her decision for the weight given to the opinion of a claimant's treating physician.  *Id.*

In the present case, while recognizing that Dr. Chirls never examined Plaintiff, the ALJ gave more weight to the medical expert's assessment of the objective medical evidence than to

the opinions of any of the doctors that examined Plaintiff.  The ALJ explained the did so because Dr. Chirls assessment that the medical evidence fails to document any disc herniation was more consistent with the objective evidence of record.  The ALJ points out that the only evidence of nerve root impingement, frequently associated with a herniated nucleus pulposus, is a finding of borderline impingement on the right neural canal at the L5-S1 level, which is not related to the herniation reported at the C6-7 level.  Additionally, the ALJ notes that examinations of Plaintiff have shown "intact neurological functioning, with no motor, sensory or reflex deficits" and "EMG/NCV tests were also negative for any lower motor neuron involvement."  (R. 149).

Moreover, as the ALJ points out, Plaintiff's treatment history with any of his physicians was very brief.  Plaintiff was seen by Dr. Baghal twice.  Plaintiff was seen by Dr. Komotar one time.  Plaintiff was treated by Dr. Croft only from January to May, 1995, even though Plaintiff's alleged disability period spanned from August 1993 to September of 1995.  "Medical opinions based on treatment relationships occurring on a relatively infrequent basis may not warrant controlling weight in determining a case."  *Smith-Levering v. Barnhart*, No. 02-1301-KAJ, 2004 WL 2211963 at * 5 (D. Del. September 24, 2004).  Thus, the ALJ did not err in giving less weight to the opinions of the doctors that examined Plaintiff.

Last, with respect to Plaintiff's complaints of pain and spasm, Plaintiff argues that the ALJ erred in making "no findings as to the plaintiff's non-exertional impairments, despite the fact that the plaintiff complaints of pain and spasm are non-exertional in nature." Pl. Br. at 24. Plaintiff however, appears to be confusing the symptoms of an impairment, *e.g.*, pain, with the functional limitations that may be caused by the impairment.  It is not the impairment that is exertional or nonexertional, but rather the resulting functional limitation.  See 20 C.F.R. §

19

404.1569a(a) ("Your impairment(s) and related symptoms, such as pain, may cause limitations of function or restrictions which limit your ability to meet certain demands of jobs. These limitations may be exertional, nonexertional, or a combination of both.")  The regulations define a nonexertional limitation as follows: "When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions."  20 C.F.R. § 404.1569a(c).  Examples of nonexertional limitations include difficulty with maintaining concentration or understanding instructions.  *Id.*  Therefore, the ALJ did not err in failing to deem Plaintiff's complaints of pain and spasm as "nonexertional impairments."

## B.  The ALJ's Conclusion With Respect to Plaintiff's RFC Is Supported by Substantial Evidence

Plaintiff argues that the ALJ's conclusion prior to September 30, 1995, Plaintiff could perform work at all exertional levels with the exception of very heavy work is not supported by the evidence.  Plaintiff points specifically to (1) the assessment by the agency doctor who found Plaintiff capable of only light work; (2) Dr. Croft's opinion that Plaintiff suffered permanent injury to his back, and (3) Dr. Sorin's report from 1991 that Plaintiff experienced significant limitation in cervical, dorsal and lumbosacral spine during flexion, extension, lateral bending and rotation that interfered with his job at the cemetery.[4]  The Court notes first that Dr. Sorin's report pre-dates Plaintiff's alleged disability onset date by two years, and further that, as

---

[4]Plaintiff also refers to Dr. Komotar's report of February 2, 1995, and claims the doctor found that Plaintiff is unable to perform his daily activities.  Pl Brf. at 25.  Plaintiff errs, however, as Dr. Komotar reported that Plaintiff is "able to p[er]form most of his daily activities." (R. 81).

discussed above, the ALJ appropriately explained his reasoning for according less weight to the opinions of the agency doctors and Dr. Croft as compared to Dr. Chirls.

As the Defendant points out, objective medical evidence and the opinion of the medical expert support the ALJ's conclusion**s** with respect to Plaintiff's RFC.  CAT scans done in 1995 of Plaintiff's head and cervical spine were normal, as was an MRI study done of Plaintiff's knees.  Around that same time, an examination of Plaintiff shortly after an automobile accident showed that while he had some limitation of motion in his spine, he had no motor sensory deficit, positive reflexes, and a normal gait and coordination.  Nerve conduction studies were normal, and the record shows no evidence that Plaintiff ever needed an assistive device such as a cane or crutches in order to get around.

As discussed earlier, the ALJ adopted Dr. Chirls conclusion that Plaintiff does not suffer from a herniated disc, and notes that his conclusion with regard to Plaintiff's RFC is generally consistent with the assessment of Plaintiff's RFC done by Dr. Chirls.  Although not raised by Plaintiff, the Court notes that Dr. Chirls opinion that Plaintiff can frequently lift and/or carry up to 50 pounds is more consistent with the definition of medium work rather than heavy work.  However, the ALJ did note in his decision that even if he concluded that Plaintiff retained the RFC for medium work rather than heavy work, Plaintiff would nonetheless be considered "not disabled" by application of Medical-Vocational Rule 203.18.  (R. 151); *see* 20 C.F.R. § 404, Subpart P, Appendix II, Table 3, § 203.18.  Accordingly, the Court finds no reason to reverse the decision of the Commissioner.

## C.  Plaintiff's Impairment Did Not Meet or Equal a Listing

Plaintiff argues that the Commissioner erred in finding that Plaintiff did not equal Listing

21

1.04, Disorders of the Spine.  A claimant will equal a Listing if he has impairments that create

medical findings that are at least equal in medical significance to those in a Listing.  20 C.F.R.

416.926.

> The relevant portion of Listing 1.04 states as follows:

> **1.04 Disorders of the Spine** (e.g. herniated nucleus pulpous, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the clauda equine) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro- anatomical distribution of pain, limitation of motion of the spine, motor loss (Atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . . or

> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.R.F, Part 404, Appendix 1, Subpart P.  With regard to this listing, the ALJ stated that

"[t]he medical evidence indicates that the claimant has degenerative disc disease, an

impairment that is severe within the meaning of the Regulations but not severe enough to meet

or medical equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."

(R. 148).  The ALJ found that there was no evidence of nerve root compromise associated with

motor loss, sensory loss, reflex loss or pseudoclaudication.

To satisfy the criteria of a listed impairment, the condition complained of "must meet <u>all</u>

of the specified medical criteria . . . [a]n impairment that manifests only some of those criteria,

no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)

(emphasis in original).  As Defendant points out, the medical evidence does not establish the

atrophy/muscle weakness or neurological deficits required by 1.04A.  For example, the record shows no deficits in Plaintiff's reflexes and sensation.  (*See* R. 81, 108, and 116).  Nor is there evidence that Plaintiff had any difficulty ambulating, as is required to meet Listing 1.04C.  Dr. Komotar, for example, noted that Plaintiff's coordination and gait were normal.

Plaintiff also argues that in determining whether Plaintiff met the Listing, the ALJ failed to consider the "combination" of plaintiff's two orthopedic conditions, namely "the cervical and lumbar regions."  Pl. Reply at 2.  However, in his decision the ALJ discusses and analyzes the medical findings relevant to both regions, and does not treat each region as a separate impairment as Plaintiff's argument would imply.  Plaintiff's argument in this regard simply has no merit.

Accordingly, the substantial evidence supports the ALJ's conclusion that Plaintiff did not meet or equal any Listing.

**IV. CONCLUSION**

For the foregoing reasons, the Court concludes that the ALJ's factual findings are supported by substantial evidence, and thus affirms the Commissioner's final decision denying benefits for Plaintiff.  An appropriate order accompanies this opinion.

DATED: February 28, 2007

/s/ Joel A. Pisano

JOEL A. PISANO, U.S.D.J.